JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Angel Arroyo; Raymond Byers; Tammy Muhammad-Whiteside; Jason Doyle; Lionel Giron; Ibrahim Ramirez; Michael Sparacello; Craig Kirkland; Naythanuel Rodriquez; Jeannine Jones; Lindsay Coppola; and Fabian Melo | New Jersey Transit Rail Operations, Inc. |

**(b)** County of Residence of First Listed Plaintiff    Union
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Essex
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert E. Myers, Esquire, Coffey Kaye Myers, & Olley, Two Bala Plaza, Suite 718, Bala Cynwyd, PA 19004; (610) 668-9800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☒ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal Employers' Liability Act, 45 U.S.C. § 51 et seq.

Brief description of cause:
Plaintiffs sustained personal injuries during their employment with New Jersey Transit Rail Operations, Inc.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Excess of $150,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:
JUDGE _____    DOCKET NUMBER _____

DATE    06/20/2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

JS 44 Reverse (Rev. 04/21)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**ANGEL ARROYO**
406 Westminster Avenue, Apartment 224
Elizabeth, NJ 07208

**RAYMOND BYERS**
3 Tanglewood Lane
Green Brook, NJ 08812

**TAMMY MUHAMMAD-WHITESIDE**
78 Coolidge Street
Irvington, NJ 07111

**JASON DOYLE**
39 Leonard Avenue
Atlantic Highlands, NJ 07716

**LIONEL GIRON**
547 Linden Avenue
Woodbridge, NJ 07095

**IBRAHIM RAMIREZ**
309 Bennet Street
Roebling, NJ 08554

**MICHAEL SPARACELLO**
42 Vail Street
Toms River, NJ 0875708060

**CRAIG KIRKLAND**
58 Levis Drive
Mount Holly, NJ

**NAYTHANUEL RODRIQUEZ**
13 Remsen Drive
Howell, NJ 07731

**JEANNINE JONES**
616 Village Drive
Somerset, NJ 08873

**LINDSAY RAE COPPOLA**
999 Hidden Lake Drive, Apt. 22 G
North Brunswick, NJ 08902

**FABIAN MELO**
582 Jackson Avenue
Elizabeth, NJ 07201

                                        Plaintiffs
                        vs.
**NEW JERSEY TRANSIT RAIL OPERATIONS,
INC.**
One Penn Plaza East
Newark, NJ 07105

                                        **Defendant**

**CIVIL ACTION**

**NO.:**

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

1

## COMPLAINT

### I.    JURISDICTION

This action arises under the Act of Congress, April 22, 1908, c. 149, 35 Stat. 65, and amendments thereto, U.S.C.A. Title 45, 51 et seq., and further amended by the Act of Congress, approved by the President of the United States on August 11, 1939, Chapter 685-First Session of the 76th Congress, known and cited as "The Federal Employers' Liability Act" (FELA).

### II.    PARTIES

1.    Plaintiff herein is Angel Arroyo, is a citizen and resident of New Jersey residing therein at 406 Westminster Avenue, Apartment 224, Elizabeth, NJ 07208.

2.    Plaintiff herein is Raymond Byers, is a citizen and resident of New Jersey residing therein at 3 Tanglewood Lane, Green Brook, NJ 08812

3.    Plaintiff herein is Tammy Muhammad-Whitehead, is a citizen and resident of New Jersey residing therein at 78 Coolidge Street, Irvington, NJ 07111.

4.    Plaintiff herein is Jason Doyle, is a citizen and resident of New Jersey residing therein at 39 Leonard Avenue, Atlantic Highlands, NJ 07716.

5.    Plaintiff herein is Lionel Giron, is a citizen and resident of New Jersey residing therein at 547 Linden Avenue, Woodbridge, NJ 07095.

6.    Plaintiff herein is Ibrahim Ramirez, is a citizen and resident of New Jersey residing therein at 309 Bennet Street, Roebling, NJ 08554.

7.    Plaintiff herein is Michael Sparacello, is a citizen and resident of New Jersey residing therein at 42 Vail Street, Toms River, NJ 08757.

8.    Plaintiff herein is Craig Kirkland, is a citizen and resident of New Jersey residing therein at 58 Levis Drive, Mount Holly, NJ 08060.

2

9. The plaintiff, Naythanuel Rodriquez is a citizen and resident of New Jersey residing therein at 13 Remsen Drive, Howell, NJ 07731.

10. The plaintiff, Jeannine Jones, is a citizen and resident of New Jersey residing therein at 616 Village Drive, Somerset, NJ 08873.

11. The plaintiff, Lindsay Rae Coppola, is a citizen and resident of New Jersey residing therein at 999 Hidden Lake Drive, Apt. 22 G, New Brunswick, NJ 08902.

12. The plaintiff, Fabian Melo, is a citizen and resident of the State of New Jersey residing therein at 582 Jackson Street, Elizabeth, NJ 07201.

13. At all times material hereto, each of the plaintiffs were employed by New Jersey Transit Rail Operations, Inc. (NJTRO) and were members of a passenger train crew and were acting within the scope of their respective train crew duties.

14. The defendant is a corporation duly organized and existing under and by virtue of the laws of the State of New Jersey and does business in the District of New Jersey.

15. Pursuant to the "New Jersey Transit Employee Protection Act," approved P.L.2019, c.137. (on 06/26/2019), the State of New Jersey has waived any sovereign or Eleventh Amendment immunity to which it may be entitled as to rail employees suing pursuant to the FELA.

16. At all times material hereto, the defendant acted individually, through its own employees, and/or through its agent, the NJ Transit Police Department.

17. At all times material hereto, the NJ Transit Police Department performed operational activities of and on behalf of the defendant and it and its employees were the agents, servants, workmen, and employees of the defendant.

3

### III.    EMPLOYMENT, OWNERSHIP AND CONTROL

18.    At the time and place hereinafter mentioned and for a long time prior thereto, the defendant, as a common carrier, operated trains carrying passengers, freight, express packages, baggage, and foreign and domestic mail, in commerce, between the different states of the United States and its territories.

19.    At the time and place hereinafter mentioned, the acts of omission and commission, causing the injuries to the plaintiffs, were done by the defendant, its agents, servants, workmen and/or employees, acting in the course and scope of their employment with and under the control of the defendant.

20.    At the time and place hereinafter mentioned, the plaintiffs and the defendant were engaged in interstate commerce between the different states of the United States and its territories.

21.    All of the property, equipment and operations involved in the incidents herein referred to were owned by and under the control of the defendant, its agents, servants, workmen and/or employees.

### IV.    NEW JERSEY TRANSIT RAIL OPERATIONS, INC. PRIOR NOTICE OF DANGEROUS CONDITIONS

22.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that its train crew employees had been frequently assaulted by passengers when those employees were attempting to collect fares, enforce fare policies and/or enforce other NJTRO Rules.

23.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey

4

Transit Rail Operations, Inc. was aware that assaults by passengers on train crew employees regularly occurred on board stationary and moving trains, at train stations, and on station platforms.

24. On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that assaults by passengers on train crew employees regularly occurred both when the trains were stopped at a station and when the trains were traveling between stations.

25. On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that passengers would often become belligerent, argumentative, disruptive, and threatening; and would also physically assault the train crews while train crew employees were attempting to collect fares, enforce fare policies and enforce other NJTRO rules.

26. On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, New Jersey Transit Rail Operations, Inc. was also aware that passengers would often become belligerent, argumentative, disruptive, and threatening; and would also physically assault the train crews while train crew employees were attempting to enforce the Covid-19 masking requirements, and further these violent passenger behaviors escalated as the pandemic continued.

27. On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that there were insufficient NJTRO employees on the trains, at train stations and on the station platforms to protect train crews from assaults by passengers while

5

the train crews were in the process of attempting to collect fares, enforce fare policies and enforce other NJTRO rules.

28.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that there were insufficient NJ Transit police officers, other law enforcement officers and/or other paid security personnel on the trains, at train stations and on the station platforms to protect train crews from assaults by passengers while the train crews were in the process of attempting to collect fares, enforce fare policies and enforce other NJTRO rules.

29.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that NJTRO and the New Jersey Transit Police Department maintained crime statistics concerning assaults and other incidents by passengers on train crew employees, including what rail lines and stations were more likely to have passenger assaults than others. However, despite the details of those statistics, NJTRO also knew that these passenger assaults could occur anywhere along the NJTRO system where train crew employees were required to interact with passengers for the collection of fares, enforcement of fare policies and enforcement of other NJTRO rules.

30.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that despite the lack of any training in law enforcement, self-defense, psychology, and other necessary subjects; NJTRO required its train crew employees to assume the role of first responders/law enforcement officers with respect to passengers and others on board its trains, at its stations, and at its station platforms.

31.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that it had not implemented any actions, standards, or policies to deter passengers from assaulting train crew employees while those employees were collecting fares, enforcing fare policies, and enforcing other NJTRO rules.

32.    On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. also had actual knowledge of at least the following employees who had been assaulted while those employees were collecting fares, enforcing fare policies and enforcing other NJTRO rules and who had then brought claims against NJTRO for the damages caused by the assaults:

| NAME | DATE OF ASSAULT | LOCATION |
|---|---|---|
| Mario M. Alonso | June 19, 1999 | Between Elizabeth & Newark, NJ |
| John Bravo | June 19, 1999 | Between Elizabeth & Newark, NJ |
|  | May 15, 2002 | Metro Park, Islin, NJ |
| Carl Cureton | January 5, 1999 | NE Corridor between New York & Newark, NJ |
| George Dabrowski | August 15, 1997 | Newark Penn Station |
| Jennifer Doyle | November 27, 2000 | In tunnel after departing New York Penn Station |
| Dwayne A. Ijames | August 20, 2006 | Elizabeth Station westbound platform |
| Raymond R. Liebold | January 8, 2000 | Morristown Station |

7

| Russell Prokop | September 2, 1999 | Meadowlands Complex, South Kearny, NJ |
| Anthony J. Russo, Jr. | December 23, 1999 | Between Morris Plains & Morristown Station, NJ |
| Wayne A. Smith | February 28, 1997 | Rahway Station, Rahway, NJ |
| Dale R. Stewart | March 16, 1992 | MMC Yard, Kearny, NJ |
| Michael A. Stewart | July 3, 1993 | MMC, Kearny, NJ |
| Stephen C. Walsh | September 28, 1998 | Westbound platform, Rahway Station |
| Kimberly A. Zoda | July 16, 1998 | Between Ave. 1 & Woodbridge Stations |

33. Furthermore, on the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. had actual knowledge of at least the following employees who had been assaulted while those employees were collecting fares, enforcing fare policies and enforcing other NJTRO rules and whose claims are presently pending or have recently been pending in a court of competent jurisdiction: Irving Baez, Richard Grabowski, Kyle Greaves, Raina Pettaway, Danielle Tramontano, Daniel Gilmartin, and Anthony Pascale.[1]

34. Furthermore, on the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, the New Jersey Transit Police Department records (which were provided by NJTRO and/or NJT Police Department in other cases pending in the District of New Jersey) charged NJTRO with actual

---

[1] Other than Mr. Baez, the other employees have lawsuits currently pending in the United States District Court for the District of New Jersey.

8

notice that there were no less than 66 rail crew assaults during the period 2013 through 2020 throughout the NJTRO system.

35.     On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that agencies, offices, and taskforces of the United States Government, including but not limited to the Federal Transit Administration, had reported and concluded that transit employees are subject to passenger assaults while collecting fares, enforcing fare policies and enforcing other transit agency rules.

36.     On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. was aware that academic studies had reported and concluded that transit employees are subject to passenger assaults while collecting fares, enforcing fare policies, and enforcing other transit agency rules.

37.     On the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their respective incidents, New Jersey Transit Rail Operations, Inc. knew or had reason to know that transit employees are subject to passenger assaults while collecting fares, enforcing fare policies and enforcing other transit agency rules because the New Jersey Legislature determined that such assaults were a sufficient problem that warranted it to enact legislation making such assaults illegal, and further, the continuation and/or escalation of the assaults required to Legislature to upgrade the nature of the offense and punishment over a period of several years.

38.     As set forth above in detail, on the date of each of the plaintiffs' respective incidents and prior to each of their respective incidents, and at least during several years prior to their

9

respective incidents, New Jersey Transit Rail Operations, Inc. had both actual and constructive knowledge and notice that its rail employees are subject to passenger assaults while collecting fares, enforcing fare policies, and enforcing other transit agency rules.

## V.    NEW JERSEY TRANSIT RAIL OPERATIONS, INC.'S NEGLIGENCE

39.    In each of the incidents set forth hereinafter, the assaults and other violent acts committed against the respective employees resulted from the negligence of the defendant, its agents, servants, workman and/or employees, including but not limited to the following:

a.    Failing to provide the respective plaintiffs with the necessary protection from physical assaults by rail passengers;

b.    Failing to provide sufficient uniformed and/or uninformed police or other security personnel on the subject trains, stations, and/or station platforms;

c.    Failing to provide NJTRO supervisory and other personnel on the subject trains, stations, and/or station platforms;

d.    Failing to provide the respective plaintiffs with necessary self-defense training;

e.    Failing to provide the respective plaintiffs with self-defense weapons, including but not limited to mace, pepper spray, Tasers, and/or similar devices;

f.    Failing to have sufficient NJTRO personnel on the trains, at the stations, and on the station platforms to protect the respective plaintiffs from assaults;

g.    Requiring the respective plaintiffs to work on trains, stations, and station platforms where there was no police or security presence;

h.    Failing to take necessary and reasonable precautions, and implement appropriate protocols, so that there was no overcrowding on the respective trains, and/or the respective stations and/or station platforms;

i.    Failing to provide secure locations on trains, at stations, and on station platforms where the respective employees could locate themselves beyond the reach of potentially dangerous passengers or retreat and locate themselves beyond the reach of actively dangerous passengers;

10

j.    Failure to have sufficient security cameras on trains, at stations, and on station platforms and to have those cameras properly monitored;

k.    Failure to properly allocate police and/or security resources;

l.    Failure to hire a sufficient number of police and/or other security personnel to protect the respective plaintiffs from the passengers while collecting fares, enforcing fare policies, or enforcing NJTRO rules;

m.    Failure to promulgate necessary rules to enable the respective plaintiffs to protect themselves and keep themselves safe from potentially violent and/or violent passengers;

n.    Failure to enforce necessary rules to enable the respective plaintiffs to protect themselves and keep themselves safe from potentially violent and/or violent passengers;

o.    Failure to conduct security manpower planning surveys and to implement recommended security manpower planning models;

p.    Failing to provide the respective plaintiffs with adequate means of communication between themselves and New Jersey Transit Police Department and/or municipal police departments;

q.    Negligently and improperly delegating its own statutory duty to protect the respective plaintiffs from the assaults by passengers involved or during the collection of fares, enforcement of fare policies, enforcement of other NJTRO policies to state, county, municipal, and other law enforcement agencies;

r.    Failing to warn the respective plaintiffs of the extent of the danger that they faced from criminal assaults while performing their duties, said dangers having been exacerbated by the failures of NJTRO set forth above; and

s.    Abrogating its statutory duty to provide its rail crew employees with a safe place to work and to protect its rail crew employees from foreseeable criminal assaults.

## VI.    INCORPORATION

Each and every paragraph previously set forth are incorporated into each and every one of the following Counts, as is set forth fully therein.

11

## COUNT I
## ANGEL ARROYO VS. NEW JERSEY TRANSIT RAIL OPERATIONS, INC.

40.    On or about July 15, 2021, at or about 11:30 a.m., and for some time prior thereto, plaintiff was employed by the defendant as a rear brakeman on a train and was working on NJTRO's Coast Line.

41.    While the plaintiff was on the train, between the Perth Amboy and Woodbridge Stations, the plaintiff saw a passenger on the train without a mask and requested that the passenger put on his mask in accordance with federal and railroad rules and regulations.

42.    The passenger eventually did put on his mask, but them took his mask off, and plaintiff again had to approach the passenger and ask him to put his mask back on and to keep his mask on.

43.    As the plaintiff was walking away from this passenger, another passenger indicated that the first passenger had taken off his mask again. However, this time the maskless passenger became belligerent and argumentative, and began cursing at the plaintiff.

44.    As the confrontation escalated, the plaintiff radioed his conductor and asked his conductor to intervene.

45.    Plaintiff's conductor informed the passenger that he would have to exit the train at the Rahway station because of his belligerent and loud behavior and his refusal to follow the masking requirements.

46.    While the conductor was on the platform, the passenger began to kick the conductor.

12

47.     Despite the plaintiff requesting the engineer to request police assistance, there were no police on the platform and therefore, plaintiff went to the conductor in the hope that he would assist him as the conductor was being assaulted by the passenger.

48.     There was no police presence on the platform for 10 to 15 minutes after the train arrived at the Rahway station.

49.     The passenger then punched the plaintiff in his forehead.  Plaintiff and the conductor eventually wrestled the passenger to the ground, and  they held him on the ground until the police eventually arrived.  During the time that the passenger was being held on the ground, the passenger was repeatedly striking the plaintiff and the conductor.

50.     As a result of  the aforementioned incident, the plaintiff sustained serious, permanent, and painful permanent injuries.

51.     As a result of the aforesaid incident, plaintiff sustained injuries to his right arm, shoulder, and wrist; full thickness tear of the supraspinatus tendon; partial tendon retraction; subacromial/subdeltoid bursitis; anterior inferior labral tear with labral blunting and signal heterogeneity; and multiple abrasions and contusions of the body.  Some or all of the above injuries are or may be permanent in nature.  The full extent of plaintiff's injuries is not presently known.

52.     As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to

13

his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

## COUNT II
## RAYMOND BYERS VS. NEW JERSEY TRANSIT RAIL OPERATIONS, INC.

53.     On or about August 29, 2021, and for some time prior thereto, plaintiff was employed by the defendant as a train crew member and was working on NJTRO's Northeast Corridor line.

54.     On the aforementioned date, at approximately 6:20 a.m., plaintiff was located at the Secaucus station.  Plaintiff was working on NJTRO's Northeast Corridor line.

55.     On the aforementioned date, prior to the train arriving in Secaucus, two individuals entered the train and put seat checks at their seats. However, when plaintiff examined the seat checks, he observed that they were not valid and told that to the passengers.

56.     After informing the passengers that their seat checks were not valid, they informed the plaintiff that they would ride to New Brunswick for free.

57.     Plaintiff then called his conductor, Lion Giron, to assist him in having both of these individuals exit the train in Secaucus.

58.     As the plaintiff and his conductor were attempting to escort the two passengers from the train on the east side of the platform at Secaucus, one of the passengers turned to the plaintiff and threatened him.  The other passenger cursed at him and when that passenger exited the train on the platform, he continued to threaten him, lifted his jacket, and then placed his hand on a knife.

59.     After receiving the threat and observing the knife, the plaintiff and his conductor were able to enter the train and close the door and asked the engineer to request the police.

14

There were no NJ Transit police or any other security personnel on the train or on the platform when these individuals exited the train.

60.    Sometime later, while the train was still at the platform, NJ Transit Police arrived, and the plaintiff and his conductor told them what happened. The police ultimately apprehended the two passengers and the plaintiff, and the conductor reported this incident to their supervisors.

61.    Plaintiff experienced intensive anxiety and fear during this episode; particularly when he saw that one of the passengers was carrying a deadly weapon.

62.    As a result of the aforesaid incident, plaintiff sustained severe emotional and psychiatric conditions, including anxiety, depression, and post-traumatic stress disorder. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

63.    As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

## COUNT III
## TAMMY MUHAMMAD-WHITESIDE VS. NEW JERSEY TRANSIT RAIL OPERATIONS

64.    On or about October 20, 2021, at approximately 9:00 a.m., plaintiff was employed by the defendant as a conductor and was working on NJTRO's Port Jervis line.

65.    On the aforementioned date, and at the aforementioned time, plaintiff was working on a train from Hoboken, New Jersey to Port Jervis, NY.

66.    On the aforementioned date, and at the aforementioned time, as the train was between the Broadway Fairlawn and Glenrock stations, plaintiff requested that a male passenger put on his mask and passenger refused to do so.

67.    Plaintiff again politely asked the passenger to put on his mask and the passenger became irate and continuously cursed at her.

68.    The plaintiff left the area where the passenger was located and sought the assistance of a co-worker located in the rail car vestibule.  However, the passenger followed her and continued to yell and scream and further argue with her and her co-worker about having to wear the mask.

69.    The plaintiff and her co-worker then informed the passenger that he would need to exit the train at the next station.

70.    The passenger exited the train onto the platform where he pulled out a switchblade knife and began moving toward the plaintiff.

71.    Because plaintiff had no weapons or no other way to defend herself, the plaintiff began swinging her arms in an attempt to defend herself and her co-worker then got between her and the passenger.  At that time, a ticket collector came to her assistance and pulled her away from the platform where the passenger was located.

72.    Plaintiff then requested that the engineer call the police and the passenger tried to escape.

73.    The passenger was apprehended by local police, the plaintiff filed a complaint, and the passenger was arrested.

16

74.     At the New Jersey Transit Police Headquarters, plaintiff learned that this passenger had previously been removed from a train for spitting on and assaulting another conductor and in another incident had been removed from a train for refusing to put on a mask; but neither the plaintiff nor any other employees had been warned of the passenger's dangerous propensities.

75.     Furthermore, no actions were taken by the defendant to prevent this passenger from using the rail system despite his previous history of assaulting rail employees.

76.     During this incident, and particularly after seeing the switchblade knife, plaintiff experienced intense fear.

77.     As a result of the aforesaid incident, plaintiff sustained severe emotional and psychiatric conditions, including anxiety, depression, and post-traumatic stress disorder. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

78.     As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of her aforesaid injuries; has been unable to attend to her usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to her great detriment and loss.

17

## COUNT IV
## JASON DOYLE VS. NEW JERSEY TRANSIT

79.    On or about August 16, 2021, the plaintiff was a member of a train crew assigned to train 3800 which originated in Morristown, Pennsylvania and was working on NJTRO's Northeast Corridor line.

80.    The incident involved in this Count began at New Jersey Transit's Rahway station and continued during its travel through Linden station including at the Linden Station.

81.    On the aforementioned date, a male and female passenger entered the car being manned by NJT employee Naythanuel Rodriquez. Mr. Rodriquez approached the two passengers to collect their tickets and to inform them of their need to wear masks. However, as Mr. Rodriquez moved toward them, the two passengers quickly moved to the adjacent car, in which NJT employee Craig Kirkland was located.

82.    The car in which Mr. Kirkland was located was the first open car of the train and contained a restroom. It was a multi-level car.

83.    The aforementioned two passengers attempted to evade Mr. Kirkland by going to the upper level of the rail car. Mr. Rodriquez went to the second level of the car and Mr. Kirkland stationed himself on the bottom level of the car.

84.    Between the top and bottom levels of the car on the mezzanine was a bathroom in which the passengers attempted to hide. However, the bathroom was locked, and the two passengers continued to walk to the lowest level of the rail car.

85.    When the passengers reached Mr. Kirkland's position, he informed them that they both must have a ticket and wear a mask. The male passenger responded, "No ticket. No mask. Not paying sh_ _. I am only going to Elizabeth. F - - - the mask. I am not paying."

18

86.     Mr. Kirkland then told them that if they were not paying and were not going to wear a mask, they would have to exit at the next station which the train was then entering which was the Linden Station.

87.     The male passenger instructed the female passenger to move away and try to hide in the crowd.

88.     Once the train arrived at the Linden station, the doors opened at the platform and Mr. Kirkland and Mr. Doyle exited the train.  The male passenger also exited the train, walked by Mr. Kirkland, and said "I should spit on you." Mr. Kirkland responded that the passenger should not do so.

89.     The male passenger, while located on the platform then spit at Mr. Rodriquez who was standing right inside the rail car door. The male passenger then proceeded to punch Mr. Rodriquez twice.

90.     Mr. Lionel Giron was another member of the train crew.  He observed Mr. Rodriquez being attacked and went to assist him.  Mr. Giron grabbed the male passenger by the knees and by his left arm and forced him to the ground.  Once on the ground, Mr. Giron and Mr. Rodriquez were attempting to detain the male passenger when the male passenger reached and pulled out a handgun.  The passenger dropped the handgun while fighting with Mr. Rodriquez and Mr. Giron.  Mr. Kirkland kicked the gun out of the way and then Mr. Rodriquez was able to kick it further way.  When Mr. Giron went to Mr. Rodriquez' assistance, Mr. Kirkland called for NJ Transit Police assistance.

91.     When no NJ Transit police arrived, and another member of the crew, Mr. Doyle observed the gun, Mr. Doyle called 911 to report a man with a gun and ask for police assistance.

19

92.     During the entire time that the crew was waiting for either the NJ Transit Police or a municipal police department to arrive, the male passenger was fighting with, kicking, and punching Mr. Giron and Mr. Rodriquez.

93.     Finally, the Linden Police Department arrived, arrested the male passenger, and retrieved the gun. Even though the NJ Transit police department had been called before the Linden Police, the NJ Transit police eventually arrived 10 minutes after the Linden Police Department had arrived.

94.     All of the members of the crew went with the NJ Transit Police and/or Linden police department to give statements, file formal charges, etc. While at the Linden Police Department, one of the detectives informed one of the members of the crew that the gun was in fact real.

95.     Throughout this entire ordeal, each of the members of the crew was terrified knowing that the male passenger had a gun and had intended to use it.

96.     As a result of the aforesaid incident, plaintiff-Doyle sustained injuries to the back and arms; contusions of the body, severe emotional and psychological injuries including depression, anger, anxiety, and post-traumatic stress disorder. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

97.     As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to

20

his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

**COUNT V**

**LIONEL GIRON (08/29/21) VS. NEW JERSEY TRANSIT RAIL OPEARATIONS, INC.**

98.     On or about August 29, 2021, and for some time prior thereto, plaintiff was employed by the defendant as a conductor and was working on NJTRO's Northeast  Corridor line.

99.     On the aforementioned date, at approximately 6:20 a.m., plaintiff was located at the Secaucus station.

100.     On the aforementioned date, prior to the train arriving in Secaucus, two individuals entered the train and put seat checks at their seats. However, when his co-worker Raymond Byers examined the seat checks, he observed that they were not valid and told that to the passengers.

101.     After informing the passengers that their seat checks were not valid, they informed Mr. Byers that they would ride to New Brunswick for free.

102.     Mr. Byers then called his conductor, Lionel Giron, to assist him in having both of these individuals exit the train in Secaucus.

103.     As the plaintiff and his co-worker were attempting to escort the two passengers from the train on the east side of the platform at Secaucus, one of the passengers turned to the plaintiff and threatened him.  The other passenger was cursing at him and when that passenger exited the train on the platform, threatened him, lifted his jacket, and placed his hand on a knife.

104.     After receiving the threat and observing the knife, the plaintiff and his co-worker were able to enter the train and close the door and ask the engineer to request the police.  There

21

were no NJ Transit police or any other security personnel on the train or on the platform when these individuals exited the train.

105.    Sometime later, while the train was still at the platform, NJ Transit Police arrived, and the plaintiff and his conductor told them what happened. The police ultimately apprehended the two passengers and the plaintiff, and the conductor reported this incident to their supervisors.

106.    Plaintiff experienced intensive anxiety and fear during this episode, particularly when he saw that one of the passengers was carrying a deadly weapon.

107.    As a result of the aforesaid incident, plaintiff sustained aggravation of emotional and psychological injuries, including anxiety, anger, depression, and post-traumatic stress disorder. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

108.    As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

## COUNT VI
### LIONEL GIRON (08/16/21) VS NEW JERSEY TRANSIT

109.    On or about August 16, 2021, the plaintiff was a member of a train crew assigned to train 3800 which originated in Morrisville, Pennsylvania and was working on NJTRO's Northeast Corridor line.

22

110.    The incident involved in this Count began at New Jersey Transit's Rahway station and continued during its travel through Linden station including at the Linden Station.

111.    On the aforementioned date, a male and female passenger entered the car being manned by NJT employee Nathaniel Rodriquez. Mr. Rodriquez approached the two passengers to collect their tickets and to inform them of their need to wear masks. However, as Mr. Rodriquez moved toward the two passengers quickly moved to the adjacent car, in which NJT employee Craig Kirkland was located.

112.    The car in which Mr. Kirkland was located was the first open car of the train and contained a restroom. It was a multi-level car.

113.    The aforementioned two passengers attempted to evade Mr. Kirkland by going to the upper level of the rail car. Mr. Rodriquez went to the second level of the car and Mr. Kirkland stationed himself on the bottom level of the car.

114.    Between the top and bottom levels of the car on the mezzanine was a bathroom in which the passengers attempted to hide. However, the bathroom was locked, and the two passengers continued to walk to the lowest level of the rail car.

115.    When the passengers reached Mr. Kirkland's position, he informed them that they both must have a ticket and wear a mask. The male passenger responded, "No ticket. No mask. Not paying sh__. I am only going to Elizabeth. F - - - the mask. I am not paying."

116.    Mr. Kirkland then told them that if they were not paying and were not going to wear a mask, they would have to exit at the next station which the train was then entering which was the Linden Station.

117.    The male passenger instructed the female passenger to move away and try to hide in the crowd.

23

118.   Once the train arrived at the Linden station, the doors opened at the platform and Mr. Kirkland and Mr. Doyle exited the train.  The male passenger also exited the train, walked by Mr. Kirkland, and said "I should spit on you." Mr. Kirkland responded that the passenger should not do so.

119.   The male passenger, while located on the platform then spit at Mr. Rodriquez who was standing right inside the rail car door. The male passenger then proceeded to punch Mr. Rodriquez twice.

120.   Mr. Lionel Giron was another member of the train crew.  He observed Mr. Rodriquez being attacked and went to assist him.  Mr. Giron grabbed  the male passenger by the knees and by his left arm and forced him to the ground.  Once on the ground, Mr. Giron and Mr. Rodriquez were attempting to detain the male passenger when the male passenger reached and pulled out a handgun.  The passenger dropped the handgun while fighting with Mr. Rodriquez and Mr. Giron.  Mr. Kirkland kicked the gun out of the way and then Mr. Rodriquez was able to kick it further way.  When Mr. Giron went to Mr. Rodriquez' assistance, Mr. Kirkland called for NJ Transit Police assistance.

121.   When no NJ Transit police arrived, and another member of the crew, Mr. Doyle observed the gun, Mr. Doyle called 911 to report a man with a gun and ask for police assistance.

122.   During the entire time that the crew was waiting for either the NJ Transit Police or a municipal police department to arrive, the male passenger was fighting with, kicking, and punching Mr. Giron and Mr. Rodriquez.

123.   Finally, the Linden Police Department arrived, arrested the male passenger, and retrieved the gun.  Even though the NJ Transit police department had been called before the

Linden Police, the NJ Transit police eventually arrived 10 minutes after the Linden Police Department had arrived.

124.    All of the members of the crew went with the NJ Transit Police and/or Linden police department to give statements, file formal charges, etc. While at the Linden Police Department, one of the detectives informed one of the members of the crew that the gun was in fact real.

125.    Throughout this entire ordeal, each of the members of the crew were terrified knowing that the male passenger had a gun and had intended to use.

126.    As a result of the aforesaid incident, plaintiff sustained injuries to the right arm; injury to the right hand; emotional and psychological injuries depression, anger, anxiety, and post-traumatic stress disorder.  Some or all of the above injuries are or may be permanent in nature.  The full extent of plaintiff's injuries is not presently known.

127.    As a result of the incident herein referred to, plaintiff -Giron has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

**COUNT VII**
**IBRAHIM RAMIREZ VS. NEW JERSEY TRANSIT RAIL OPERATIONS, INC.**

128.    On or about April 8, 2021, and for some time prior thereto, plaintiff was employed by the defendant New Jersey  Transit Rail Operations, Inc. as a passenger conductor and was working on NJTRO's Northeast Corridor line.

25

129.   On the aforementioned date, and at the aforementioned time, plaintiff was assigned to a train travelling from New York City toward Metuchen.

130.   On the aforementioned date, at approximately 7:40 p.m., a passenger boarded the train at the Metro Park Station.

131.   The aforementioned passenger had extremely loud music blaring, violating NJTRO rules and disturbing other passengers, and did not have a ticket when asked by the plaintiff for his fare.

132.   When the train arrived at the Metuchen Station, plaintiff informed the passenger that because he did not have a ticket and refused to pay the fare, the passenger would have to exit the train.

133.   When the plaintiff asked the passenger to pay his fare and to leave the train, and when the passenger refused to do so, the passenger became belligerent.

134.   Pursuant to NJTRO rules, the plaintiff exited  the train and was standing on the Metuchen platform as passengers left the train and new passengers began to board.

135.   The plaintiff observed the passenger who had been removed from the train walking past him.

136.   While on the platform, the passenger came behind the plaintiff and struck him in the back of the head, knocking him to the platform, and punching him several more times in the face and neck.  Plaintiff's co-worker ticket collector Kevin McCarthy observed the assault and ran toward the plaintiff to assist him at which time the passenger ran away.

137.   As a result of the aforesaid incident, plaintiff sustained a concussion and post-concussion syndrome; multiple contusions of the head, back of the head, face, lips, and jaw; lacerations of the face; injury to the left knee and foot; hallux bulges deformity; herniated lumbar

26

disc at level L3-L4; herniated lumbar disc at level L4-L5; annular disc bulge in level C4-C5; herniated cervical disc at levels C5-C6 and C6-C7; Left C6 radiculopathy; tendinosis of the shoulder; tendinosis of the supraspinatus, infraspinatus and subscapularis tendons; impingement of the supraspinatus outlet; biceps tenosynovitis; and severe emotional injuries. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

138.    As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; and has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

## COUNT VIII
## MICHAEL SPARACELLO VS. NEW JERSEY TRANSIT RAIL OPERATIONS, INC.

139.    On or about August 19, 2020, and for some time prior thereto, plaintiff was employed by the defendant New Jersey Transit Rail Operations, Inc. as a passenger conductor and was working on NJTRO's Northeast Corridor line.

140.    On the aforementioned date, and at the aforementioned time, plaintiff was assigned to train 3805.

141.    On the aforementioned date, and at the aforementioned time, plaintiff observed an argument between an unidentified male passenger and the ticket collector, Mr. Dan Tarpy.

142.    Plaintiff also observed the unidentified passenger aggressively pushing Mr. Tarpy into the corner of the vestibule.

27

143.   As the conductor of the train, plaintiff was responsible for the safety of the train, the passengers on it, and the crew.

144.   Therefore, after observing the argument between Mr. Tarpy and the passenger, and after observing the passenger push Mr. Tarpy into the corner of the vestibule; the plaintiff approached them hoping to defuse and/or resolve the apparent problem.  When plaintiff arrived at the location of the unknown passenger and Mr. Tarpy, plaintiff inquired of the passenger whether there was anything that he could do to assist, and the passenger belligerently said to him, "mind your own business."

145.   At that point, the passenger returned from the vestibule to the rail car but then quickly reversed him movement and returned to the vestibule.

146.   Plaintiff again approached the passenger in the hope of preventing an altercation, when suddenly and without warning, the belligerent passenger struck the plaintiff in the jaw, scuffled with the plaintiff in the vestibule, and caused the plaintiff to experience significant pain until the unidentified passenger was separated from the plaintiff by Mr. Tarpy and passengers.

147.   When the train reached Secaucus, plaintiff requested medical attention and was transported to the Hudson Regional Hospital.

148.   As a result of the aforesaid incident, plaintiff sustained injuries to the right shoulder; injury to the left shoulder; multiple abrasions and contusions of the body; multiple internal injuries to the right shoulder; and emotional and psychological injuries resulting from the attack.  Some or all of the above injuries are or may be permanent in nature.  The full extent of plaintiff's injuries is not presently known.

149.   As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the

28

future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

## COUNT IX
## CRAIG KIRKLAND VS. NEW JERSEY TRANSIT RAIL OPERATIONS, INC.

150. On or about August 16, 2021, the plaintiff was a member of a train crew assigned to train 3800 which originated in Morrisville, Pennsylvania and was working on NJTRO's Northeast Corridor line.

151. The incident involved in this Count began at New Jersey Transit's Rahway station and continued during its travel through Linden station including at the Linden Station.

152. On the aforementioned date, a male and female passenger entered the car being manned by NJT employee Nathaniel Rodriquez. Mr. Rodriquez approached the two passengers to collect their tickets and to inform them of their need to wear masks. However, as Mr. Rodriquez moved toward the two passengers quickly moved to the adjacent car, in which NJT employee Craig Kirkland was located.

153. The car in which Mr. Kirkland was located was the first open car of the train and contained a restroom. It was a multi-level car.

154. The aforementioned two passengers attempted to evade Mr. Kirkland by going to the upper level of the rail car. Mr. Rodriquez went to the second level of the car and Mr. Kirkland stationed himself on the bottom level of the car.

155. Between the top and bottom levels of the car on the mezzanine was a bathroom in which the passengers attempted to hide. However, the bathroom was locked, and the two passengers continued to walk to the lowest level of the rail car.

156. When the passengers reached Mr. Kirkland's position, he informed them that they both must have a ticket and wear a mask. The male passenger responded, "No ticket. No mask. Not paying sh_ _. I am only going to Elizabeth. F - - - the mask. I am not paying."

157. Mr. Kirkland then told them that if they were not paying and were not going to wear a mask, they would have to exit at the next station which the train was then entering, which was the Linden Station.

158. The male passenger instructed the female passenger to move away and try to hide in the crowd.

159. Once the train arrived at the Linden station, the doors opened at the platform and Mr. Kirkland and Mr. Doyle exited the train. The male passenger also exited the train, walked by Mr. Kirkland, and said "I should spit on you." Mr. Kirkland responded that the passenger should not do so.

160. The male passenger, while located on the platform then spit at Mr. Rodriquez who was standing right inside the rail car door. The male passenger then proceeded to punch Mr. Rodriquez twice.

161. Mr. Lionel Giron was another member of the train crew. He observed Mr. Rodriquez being attacked and went to assist him. Mr. Giron grabbed the male passenger by the knees and by his left arm and forced him to the ground. Once on the ground, Mr. Giron and Mr. Rodriquez were attempting to detain the male passenger when the male passenger reached and pulled out a handgun. The passenger dropped the handgun while fighting with Mr. Rodriquez

30

and Mr. Giron. Mr. Kirkland kicked the gun out of the way and then Mr. Rodriquez was able to kick it further way. When Mr. Giron went to Mr. Rodriquez' assistance, Mr. Kirkland called for NJ Transit Police assistance.

162.    When no NJ Transit police arrived, and another member of the crew, Mr. Doyle observed the gun, Mr. Doyle called 911 to report a man with a gun and ask for police assistance.

163.    During the entire time that the crew was waiting for either the NJ Transit Police or a municipal police department to arrive, the male passenger was fighting with, kicking, and punching Mr. Giron and Mr. Rodriquez.

164.    Finally, the Linden Police Department arrived, arrested the male passenger, and retrieved the gun. Even though the NJ Transit police department had been called before the Linden Police, the NJ Transit police eventually arrived 10 minutes after the Linden Police Department had arrived.

165.    All of the members of the crew went with the NJ Transit Police and/or Linden police department to give statements, file formal charges, etc. While at the Linden Police Department, one of the detectives informed one of the members of the crew that the gun was in fact real.

166.    Throughout this entire ordeal, each of the members of the crew were terrified knowing that the male passenger had a gun and had intended to use.

167.    As a result of the aforesaid incident, plaintiff-Kirkland sustained injuries to the back and arms; contusions of the body, severe emotional and psychological injuries, including depression, anger, anxiety, post-traumatic stress disorder and aggravation and exacerbation of the same. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

31

168.    As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

**COUNT X**
**NAYTHANUEL RODRIQUEZ VS. NEW JERSEY TRANSIT**

169.    On or about August 16, 2021, the plaintiff was a member of a train crew assigned to train 3800 which originated in Morrisville, Pennsylvania and was working on NJTRO's Northeast Corridor line.

170.    The incident involved in this Count, began at New Jersey Transit's Rahway station, and continued during its travel through Linden station including at the Linden Station.

171.    On the aforementioned date, a male and female passenger entered the car being manned by NJT employee Naythanuel Rodriquez. Mr. Rodriquez approached the two passengers to collect their tickets and to inform them of their need to wear masks. However, as Mr. Rodriquez moved toward the two passengers quickly moved to the adjacent car, in which NJT employee Craig Kirkland was located.

172.    The car in which Mr. Kirkland was located was the first open car of the train and contained a restroom. It was a multi-level car.

173.    The aforementioned two passengers attempted to evade Mr. Kirkland by going to the upper level of the rail car. Mr. Rodriquez went to the second level of the car and Mr. Kirkland stationed himself on the bottom level of the car.

32

174. Between the top and bottom levels of the car on the mezzanine was a bathroom in which the passengers attempted to hide. However, the bathroom was locked, and the two passengers continued to walk to the lowest level of the rail car.

175. When the passengers reached Mr. Kirkland's position, he informed them that they both must have a ticket and wear a mask. The male passenger responded, "No ticket. No mask. Not paying sh_ _. I am only going to Elizabeth. F - - - the mask. I am not paying."

176. Mr. Kirkland then told them that if they were not paying and were not going to wear a mask, they would have to exit at the next station which the train was then entering which was the Linden Station.

177. The male passenger instructed the female passenger to move away and try to hide in the crowd.

178. Once the train arrived at the Linden station, the doors opened at the platform and Mr. Kirkland and Mr. Doyle exited the train. The male passenger also exited the train, walked by Mr. Kirkland, and said "I should spit on you." Mr. Kirkland responded that the passenger should not do so.

179. The male passenger, while located on the platform then spit at Mr. Rodriquez who was standing right inside the rail car door. The male passenger then proceeded to punch Mr. Rodriquez twice.

180. Mr. Lionel Giron was another member of the train crew. He observed Mr. Rodriquez being attacked and went to assist him. Mr. Giron grabbed the male passenger by the knees and by his left arm and forced him to the ground. Once on the ground, Mr. Giron and Mr. Rodriguez were attempting to detain the male passenger when the male passenger reached and pulled out a handgun. The passenger dropped the handgun while fighting with Mr. Rodriquez

33

and Mr. Giron. Mr. Kirkland kicked the gun out of the way and then Mr. Rodriquez was able to kick it further way. When Mr. Giron went to Mr. Rodriquez' assistance, Mr. Kirkland called for NJ Transit Police assistance.

181. When no NJ Transit police arrived, and another member of the crew, Mr. Doyle observed the gun, Mr. Doyle called 911 to report a man with a gun and ask for police assistance.

182. During the entire time that the crew was waiting for either the NJ Transit Police or a municipal police department to arrive, the male passenger was fighting with, kicking, and punching Mr. Giron and Mr. Rodriquez.

183. Finally, the Linden Police Department arrived, arrested the male passenger, and retrieved the gun. Even though the NJ Transit police department had been called before the Linden Police, the NJ Transit police eventually arrived 10 minutes after the Linden Police Department had arrived.

184. All of the members of the crew went with the NJ Transit Police and/or Linden police department to give statements, file formal charges, etc. While at the Linden Police Department, one of the detectives informed one of the members of the crew that the gun was in fact real.

185. Throughout this entire ordeal, each of the members of the crew were terrified knowing that the male passenger had a gun and had intended to use.

186. As a result of the aforesaid incident, plaintiff- Rodriquez sustained injuries to the back and arms; contusions of the body, and severe emotional and psychological injuries including depression, anger, anxiety, post-traumatic stress disorder. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

34

187.    As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

## COUNT XI
## JEANNINE JONES VS. NEW JERSEY TRANSIT

188.    On or about June 6, 2021, at approximately 9:45 a.m. and for some time thereto plaintiff was employed by defendant New Jersey Transit as a passenger train crew member and was working on the Northeast Corridor line.

189.    On the aforementioned date, and at the aforementioned time, as the train pulled into the Linden, New Jersey station, the plaintiff saw a passenger who neither had train fare or a mask.

190.    On the aforementioned date, at the aforementioned time, the plaintiff informed the passenger that it would be necessary for the passenger to pay the fare and to use a mask or it would be necessary for the passenger to leave the train.

191.    On the aforementioned date, and at the aforementioned time, the passenger began to leave the train while using profanity towards the plaintiff.

192.    The passenger stepped off the train, turned around, and then spit in the plaintiff's face.

193.    The sputum got into the plaintiff's eyes and on her clothing.

35

194. After assaulting the plaintiff, the passenger fled the scene and ran off of the platform.

195. As a result of this incident, the plaintiff has experienced the significant injuries more particularly hereinafter set forth.

196. As a result of the aforesaid incident, plaintiff sustained severe emotional and psychological injuries including depression, anger, anxiety, and post-traumatic stress disorder; fear of contracting a disease such as hepatitis, AIDS, COVID 19 or some other disease as a result of being spit upon. Some or all of the above injuries are or may be permanent in nature. The full extent of plaintiff's injuries is not presently known.

197. As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of her aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to her great detriment and loss.

**COUNT XII**
**LINDSAY RAE COPPOLA VS. NEW JERSEY TRANSIT**

198. On or about December 12, 2021, at or about 2:30 PM, and for some time prior thereto, plaintiff was employed by the defendant as a passenger train crew member and was working on NJTRO's Northeast Corridor line

199. On the aforementioned date and time, plaintiff was collecting tickets and fare on a train that was traveling between the Rahway and Metro Park stations.

200. The train was excessively overcrowded. There was only standing room for a large number of passengers.

201. Plaintiff approached one passenger to collect his fare and to ask him to properly wear his Covid mask.

202. The passenger belligerently refused plaintiff's request that he pay his fare and to properly wear his mask. He stated that he would not pay because of the train's overcrowding.

203. Plaintiff attempted to radio her conductor to request his assistance, but could not reach him on the radio. Therefore, plaintiff went to the car where the conductor was located.

204. When she arrived, another crew member was in the process of informing the conductor about the problem passenger.

205. The conductor approached the passenger and again requested that he pay his fare and properly wear his mask. However, the passenger once again refused to do either.

206. By this time, the train had arrived at the Metuchen Station.

207. The conductor then requested the police board the train and stated that he would not move the train from the station until the police arrived and boarded the train.

208. The plaintiff and the passenger were on the Metuchen Station platform and when the plaintiff was re-entering the train, the passenger violently tackled the plaintiff from behind, causing her to fall between the door and the platform.

209. No police arrived before this assault and the NJ Transit Police did not arrive until after the municipal police arrived and had arrested the assaulting passenger.

210. As a result of this incident, plaintiff injured her low back, right leg, right hip, right arm, neck, shoulders, and lower extremities. Plaintiff has paresthesia and nerve injury in her

right arm and hand. Plaintiff experienced multiple contusions. Plaintiff has also experienced psychological injuries. The exact extent of these injuries is not fully known.

211. As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of her aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to her great detriment and loss.

## COUNT XIII
## FABIAN MELO VS. NEW JERSEY TRANSIT

212. On or about May 30, 2022, at or about 11:37 PM, and for some time prior thereto, plaintiff was employed by the defendant as a passenger train crew member and was working on NJTRO's Northeast Corridor line.

213. On that date and time, plaintiff's train was located at the Elizabeth Station in Elizabeth, New Jersey.

214. Prior to arriving at the Elizabeth Station, a group of 11 individuals entered the train at the Woodbridge Station.

215. Plaintiff attempted to collect the fares from these individuals, but they were threatening and belligerent.

216. One of the passengers said, "I'll punch you in the f---ing mouth."

217. When the train arrived at the Elizabeth Station, there were no police or security personnel at the station and its platform.

38

218.   When the train arrived at the Elizabeth Station, as per NJTRO policies and orders, plaintiff had to exit the train and stand on the platform.

219.   While on the platform, several of the unruly passengers assaulted the plaintiff.

220.   Plaintiff had been assaulted one week earlier when a disgruntled passenger threw hot coffee on him.

221.   NJ Transit police did not arrive at the platform until 20-25 minutes after plaintiff was assaulted.

222.   As a result of this incident, plaintiff sustained multiples contusions of the body and muscular injuries.  The full extent of plaintiff's injuries is not presently known.

223.   As a result of the incident herein referred to, plaintiff has suffered a loss and impairment of earnings and earning power and may suffer the same for an indefinite time in the future; has undergone great physical pain and mental anguish and may undergo the same for an indefinite time in the future; has been obliged to and will have to continue to expend large sums of money in the future in an effort to effect a cure of his aforesaid injuries; has been unable to attend to his usual duties and occupation and may be unable to attend to the same for an indefinite time in the future, all to his great detriment and loss.

WHEREFORE, each plaintiff requests judgment against the defendant for a sum in excess of $150,000.00 upon each of the Counts specific to him or her.

**COFFEY KAYE MYERS & OLLEY**

By:_____ */s/ Robert E. Myers*_____
       **ROBERT E. MYERS**
       **MICHAEL J. OLLEY**
       **LAWRENCE A. KATZ**
       *Attorneys for Plaintiffs*
       **Suite 718, Two Bala Plaza**
       **Bala Cynwyd, PA  19004**
       **(610) 668-9800 – phone**
Date:  June 20, 2022        **(610) 667-3352 – fax**

39